Good afternoon. Good afternoon, Your Honor. We have two cases this afternoon after the four we had this morning. And the first this afternoon is Petillion v. United Refining Company et al. It's numbers 13-4633 and 4743. Mr. Rillo and Ms. Brett. Thank you, Your Honor. Your Honor, my name is Christopher Rillo. I represent the Appellants United Refining Company and it's defined benefit plan here. At the outset, may I reserve four minutes for rebuttal, sir? You sure can. Thank you, Your Honor. This case did not involve a unilateral change by a plan sponsor. Although if you read the district court opinion, that's not clear. The rattle was after plan professionals came to the fiduciaries and stated that you were misinterpreting the plan and they consulted with their professionals that the plan was changed. My guess is that part of this is just when you see that somebody like Mr. Petillion, he got his, he retired or was terminated in 89, is that correct? I believe that's correct and he was in pay status by 95. Sixteen years later, he gets this letter that says we miscalculated. They said what to him, you're not going to get any more for a while or suspend what he was getting and by the way, you owe us money. Correct. In no look of too good. Well, it doesn't look, it looks fine when you look at Mr. Petillion's testimony, which is he expected to receive a reduced pension. That's at page 1655 of the record. Mr. Petillion was deposed. All the other ones did too? Ms. Eldridge did as well. How many others are there? There were 15 in pay status, your honor, and there's about 170 members of the class that are not in pay status. There's 23, 28. I realize you didn't draft the document. I realize you didn't draft the summary plan descriptions. You didn't draft the handbooks, but these things go all over the place with regard to the 80 and 87 plan. They sure do, and that's the point that we're making. As the district court found, they're susceptible to several different readings, including the reading that we've addressed. But these are your own documents. They are. So everything, but the good news I guess there is everything relates back to the plan, and the 80 and 87, especially amendment 5 to the plan, makes it clear that they do get, there's no adjustment or actuarial adjustment for leaving early for whatever reason. I don't know why. I beg to differ with you, your honor. It makes it clear that they do not receive the same terms as early retirees, and that's the entire point. What does amendment 5 do? Amendment 5 was put in, amendment 5 to the 1980 plan, was put in specifically to give early retirees a subsidized retirement. But amendment 5, by its language, specifically refers to the fact that you have to be in employment with the company at the time you introduce retirement. At the same time, the SPDs, which are enforced throughout this period of time, gap fill and explain in concrete detail that you will be actuarially reduced and give the actuarial reduction factors. But doesn't 701 refer back to 503, and 503 refer to 502 and 501? In the 1980 plan, 701 does refer to 503, but there's a purpose for that, and the purpose is 206A, which sets the floor for what people get. Under 206A, it specifically says you have to permit people, participants, to enter pay status at the same time as early retirees, and they are actuarially reduced. You only have to give them an actuarially reduced pension because, like Social Security, they're receiving a payment before you adjust for the mortality tables. So the reference to 503 in certainly the 80 plan, and certainly it's more concrete in the 87 plan, is two things. It gives them the time that they're going to commence, and also gives them the total amount, which is total mortgage, as I say in the brief, of what they're due, because you have to calculate that by years of service. Well, let's say Mr. Cotillion, he was what? He was an early retiree? No, he was not. Mr. Cotillion was a deferred vested terminated participant, and that's the point. The plans carefully throughout the period of time, Judge Ambrose. But he was vested. He was vested, but the plans carefully delimit. It's sort of like tenure when you're vested, right? I beg your pardon, sir? Vested is like tenure? Yes. He was vested, and he had a right to some payment. So once you get tenure, can somebody come in and take the rug out from under you? That's the argument that the other side's making. But they didn't take the rug out from underneath them. Whether they did. Under 206A. When you're asking me for money back, it's. . . Well, that happens. That's the situation that happens because you're obligated, underneath ERISA, to get that money back. You cannot pay benefits underneath the statute. It sounds harsh, but it's really not. It's for the benefit of all participants. You can't pay a greater benefit than what someone's entitled to under the plan. It is harsh to those who get that kind of letter. The question is, can you legally do it many years later? The question is that, and you can legally do it many years later, assuming that the plan language can be read the way we read it. And that's where Concrite comes into play. Well, before you go there, Section 204G talks about the amendment. And you know the definition of what is an amendment comes into play in this appeal. Why isn't Section 5.4C of the plan documents, why isn't that an amendment? It came in for the 95 and 2000 plans. Pardon me, Judge Chicago. Sorry to interrupt you. Go, go, go. 5.4C is not an amendment because it simply codifies what the earlier language was. And that was the judgment reached. 5.4C was adopted after the Gust amendments. Periodically, Your Honor, the Internal Revenue Service issues these releases indicating that you have to amend your plan documents. It gives you a period of time of seven to eight years to amend them. And they give certain things that they want listed in each plan document. And one of the things that they wanted, and as the expert's declaration showed, one of the things that they wanted was clear, more vesting provisions. 5.4C simply reiterates what was in the earlier plan, which is these folks only get an actuarially reduced retirement. Is there anything in either plan, 80 or 87, that explicitly provides actuarial adjustment of TVP benefits? The only thing in the plan that specifically provides, it's not in the plan, is the SPD. There's nothing in the plan that provides them with subsidized benefits. But the plan controls, right? You have to read the plan with all of the definitions. That's HINE. That's the other language. Plans are not like insurance contracts where they're read in favor of a participant or they're read against a company. They're simple contracts that have to be read in their entirety. They're not so simple, though. Not simple, not at all, as you discovered in Shaver, Your Honor. And the idea here is when you read all the definitional sections, it leads you to one thing, which is all these folks were promised was an unreduced pension at age 65, which meant it had to be reduced under 206A. The second theme of our briefing I thought we presented. Let's go back to judgment. Walk me through the way to calculate benefits for TVPs and stay within the four corners of the 80 and 87 plan. The only way to calculate benefits for DVTs is you look to see what the total benefit is under 503, the total house mortgage, how much money they've earned given their years of service and their pay. You then look to see what year they commence. You then look to the definitional section to see what they're actually promised, which is an unreduced pension at age 65. And then the SPD gap fills, which it's permitted to do. We've given you the cases. And the SPD is crystal clear. But they were given under 502 an accrued retirement income, were they not? They were given an accrued retirement income. And that was calculated in accordance with 501? It was calculated 501, which is the provision for normal retirement age. Meaning 65 you get an accrued retirement income, Judge Ambrose. I understand. And I realize that a lot of folks do an actuarial adjustment. But here it wasn't done. It looks like the plans post-1987, the 1995 plan, for example, is different. It's your way, right? The plan language is different for the 1995 plan and the 2002 plan. It certainly is. So what caused – I couldn't quite figure this out from the briefing. Was there something where the IRS told you you can't do this? Or because the IRS specifically says it doesn't comment on ERISA? Or is it just somebody was doing an actual – looking at this from an actuarial point of view and realized, hey, we've been doing this all wrong for all these years? No. And the reason why – let me pick up the last point you're saying. The reason why someone didn't realize we were doing it all wrong is because they still granted unreduced benefits to these people three years after it's unquestioned that the 1995 plan was drafted. It was drafted January 1, 2002, and the error wasn't discovered until late 2004 and the participants notified in 2005. So there was no realization that they were doing anything wrong. Rather, it was we're codifying what we did before. The simple answer to your question is not simple. There was a series of correspondence with the IRS. Nothing in this case is simple. I know. It's an exciting case, though. But the answer to your question is there was a series of communications with the IRS over various definitions in the plan, and evidently the drafter, Mr. Olsen, who passed away, attempted to conform to that. Now, that's one of the questions that could have been answered, by the way, had we exhausted remedies here. We could have built an administrative record. I think the perception, I mean, the argument they have is, look, strip it all away. It's futile. Nothing was going to change. That's not true. I mean, that's not true. They don't have the case law. They didn't attempt to exhaust remedies. They didn't move with any sort of alacrity that the cases demand. They waited four years, nearly four years after all this happened. The question also is, and it's a tough one, if this is a claim under the anti-cutback rule, you don't really need exhaustion. If it's essentially a contract claim, you would need exhaustion. And do we really need to decide whether this is an anti-cutback rule or a contract claim? Your Honor, it's a plan interpretation case. You don't get to the cutback unless their interpretation of the plan was correct. But for 16 years you interpreted it the way they're now interpreting it. That's just as the defendants in Concrite did, and the Supreme Court said, there's no one strike and you're out. Chief Justice Roberts could not be more clear. He said people make mistakes, even ERISA plan administrators, and therefore there is no one strike, you're out. Wasn't Concrite a case where there was something that was explicit? I beg your pardon, Your Honor? In other words, the plan was explicit. I don't understand your question. I'm sorry. Well, can't Concrite be distinguished? In other words, if you say that under Concrite that the administrator gave a reasonable interpretation, you may not like it, but you lose. But it may not be too much of a leap here to say that what the plan administrator did, Mr. Laughlin, was give an unreasonable interpretation, and therefore Concrite doesn't apply. Time has expired. May I answer that question? Absolutely. The answer to that question is found in the district court opinion, first of all. On pages 25 and 26, he says there are several interpretations that can be made from this plan language, including ours. Furthermore, in Zembrowski, I realize it's an unpublished decision, but Zembrowski, a panel of this court, said that where you have several possible interpretations, you don't have any sort of finding that the plaintiffs are entitled to anything. You have to defer to the defendant's interpretation, and that's the Concrite. As long as there's a reasonable interpretation, as the district court found on pages 25 and 26 that supports our reading of the plan, we prevail. All right. Let's hear it from your opposing counsel. We'll get you back in rebuttal. Ms. Brett. May it please the Court, my name is Tybee Brett. I represent the plaintiffs, cross appellants John Cotillion and Beverly Eldridge and the certified class of Terminated Vested Participants in the United Refining Plan. Can I request two minutes for rebuttal on the cross appeal? Actually, well, would you, on the what? On the cross appeal. On the cross appeal. If it's you may just want to deal with all your time now, because I'm not even sure that issue is going to come up. All right. This case involves a straightforward application of ERISA's anti-cutback rule, which applies. Parenthetically, if it does come up, we'll give you a minute or two. Okay. Thank you. The first point is that there was no operational that required any reinterpretation of the plan. The unambiguous language of the 1980 and 87 plans provided that TVPs get the same unreduced retirement benefit as early retirees. And it was correctly interpreted by the plan in this fashion, not only in the notices that they gave to Terminated Vested when they left their employment, in notices that were required by the IRS. The one logical problem you have, or one could argue, here, a participant doesn't receive benefits until there's actual retirement, or could not receive benefits until actual retirement. It seems the way the plan was at least interpreted by everybody for 16 years is, it doesn't seem there's really any economic incentive to retire later than earlier. There is no incentive. That's why you have an actuarial adjustment, so that you have people working at least until close to 65 unless there's a health issue or something else comes up. But it would seem to make sense that you would have something in a plan that says, hey, Ambrose, if you retire at 59 and a half when you're first eligible, there's going to be an actuarial adjustment because you're not 65. Yes, but that's not the plan that we have here. The plan clearly provided early retirees, they could retire at the early retirement date and get a full unreduced benefit. And then what about the fact that this person was terminated as opposed to? Well, he terminated his employment, and in the record there's rationales for why the plan might have been designed this way, but that's neither here nor there. The fact of the matter is when employees with five years of vesting service terminated their employment, they were told by the company, and this interpretation is supported by the language of the plan, that you may commence, you may have the option to choose to commence your full benefit, your full accrued annual benefit at your early retirement date, which was first 60 and then 59 and a half. That's what they were told. That's what they did. And that's how the plan unambiguously reads. Any other reading of the plan, there is a section for terminated vested participants, and it clearly leads the reader back to the definitions, excuse me, the provisions that govern early retirees. So what was the amendment in this case? What gives you your hook to the section that you're suing? In 2003, the defendants adopted an amendment, which they then applied retroactively to our class of participants to reduce their benefits. And it wasn't a reinterpretation. There's not one iota of evidence that the defendants reinterpreted the plan to correct an operational error. There's no evidence of what the actuaries may have told them. There's no evidence of what OSIN might have done. In fact, we asked for that evidence. We were denied it. Is there any evidence as to what the perception was that the IRS was requiring? With respect to the IRS, it's unclear why they went to the IRS in the first place. They didn't need to do that. But they went to the IRS. They gave the IRS not the language under which these people had terminated their employment and under which their rights vested. Rather, they used the later 2003 language. And they told the IRS, taking off the front page, by the way, so the IRS had no way of knowing that they were being given the wrong plan language, and said, here's the real language of the plan, which it wasn't. And based on this language, we overpaid these people, and we have to get our money back. This is when, in 2002 or 2005? The IRS compliance statement happened in 2005, 2006. And it was a way to try to recoup money from participants in pay status. But this whole idea of a reinterpretation of the plan language never came up until we filed this lawsuit. Until then, all the evidence shows that the participants were told that the plan required an actuarial reduction. Yet, what they were given in 2005, people who were not yet in pay status, like Plaintiff Beverly Eldridge, were given a letter saying, we're trying to clarify your benefit. You're not entitled to the whole thing at early retirement date. And they gave them, attached to these notices, they gave the participants provisions from the 2002 plan, not the provisions from the 1980 or 87 plan under which these individuals had retired. So it's clear, that's why it's a straightforward application of the anti-cutback rule. For 17 years, this plan is interpreted to provide an unreduced early retirement benefit to terminated vested participants. But your adversary says there are other places where it was pretty clear that there should have been a reduced actuarial benefit. And it just was never, I guess somebody just didn't do the right thing, according to them. Well, as Judge McLaughlin correctly found, those interpretations, first of all, they read language into the plan that's not there. They read into the plan this notion that the only individuals entitled to this reduced early retirement are those who retire from the company on their early retirement date. It speaks in terms of early retirement date, which if you go through the plan, always refers to the participant's birthday, not when they retire from the company. But their so-called reinterpretation, and again, the plan administrator has never reinterpreted. So Cochrane has no application? None whatsoever. It's an opposite. Cochrane does not anti-cutback case. But it does say that the administrator can make a mistake, and that's not going to be binding. It's not going to be a forever type thing. The reason here, there was no mistake for 17 years. The mistake was retroactively reducing the benefit. But because the plan unambiguously provided these benefits, the ‑‑ Hang on just for a second. You're saying in 2005 they could have said going forward you are actuarially adjusted? They could have said to new employees. To new employees. On a going forward basis. That's what I thought. I just wanted to clarify that. Yes. On a going forward ‑‑ it's not that the amendment was illegal. Not Cotillion, for example. No. If I understand your question, Judge Ambrose. In other words, when you said in 2005, they can't ask for the money back, but they could do something. And I'm just trying to clarify what that something is. It would only be for new employees. It wouldn't be for people who are already vested and retire or left like Mr. Cotillion. Correct. We're not tying their hands in terms of ending the plan on a going forward basis. Just 204G prohibits them from amending the plan to reduce an already accrued benefit, which all the class members had. So their interpretation reads language into the plan that's not there. And it sends you all over the plan, but it ignores the explicit cross reference in Section 7.02 of the plan, which explicitly says the terminated vested participants get the same benefit, the same annual benefit at early retirement date that early retirees get. End of story. It's not that hard. It's not complicated at all. And I think the most telling point is if it had been, if there had been some room to interpret the plan differently, when they asked for the money back, when they went to the IRS, they would have given them the right plan language, the plan in effect at the time these participants vested, but they didn't. Not only when they notified the participants that they were clarifying the plan, but when they went to the IRS for a voluntary compliance statement, they gave the IRS the 2002 plan language, which was not adopted until 2003, and they applied it retroactively to these participants. What's the argument with regard to the non-exhaustion here? Well, there's a couple of arguments. First of all, this is a statutory claim, the exhaustion. And they're saying it's not a statutory claim, that it's essentially a contract claim that requires exhaustion. It's a straightforward application of the anti-cutback rule. And so there is no requirement of exhaustion. No, Mr. Rillo said in response to that, you don't get to the anti-cutback rule without the predicate of having the contract claim. Conceding, if I concede that point, there's still futility. Well, first of all, they have not met their burden of proof on showing that they've provided a procedure by which to appeal or challenge the so-called interpretation or reinterpretation. They not only told participants, gave participants the wrong plan language. Participant opens a letter and had been promised an unreduced benefit, gets a page from a different plan document saying that benefits, early retirement benefits, will be reduced. There's nothing in those letters that say if you want to challenge this benefit determination, you can file an appeal. And the few people who nonetheless, including Cotillion, who called the plan administrator and said, you know, what do I do about this? I depended on this benefit. What do I do? Mr. Laughlin, who was the acting for the plan administrator, told each one of them, there's nothing you can do. We made a mistake. There's nothing you can do to challenge it. Those who went through the process were told that we went to the IRS to confirm this interpretation, to strip ourselves of authority. So if there ever was a definition, if there was ever a case of futility, then this is it. Exhaustion doesn't apply. They haven't met their burden of proof on exhaustion because they didn't provide planned procedures to challenge this decision. And it was futile. We met our burden of proving futility. There's not one iota of evidence to show that an appeal would have done anybody any good. They were committed to this plan interpretation or this plan of reinterpretation. They were committed to the cutback, and nobody was going to change their minds. And that's what they told the participants. And it's all in the record, the reams of letters that were sent. So what actually, if you can point to something, is the amendment that gives you the hook? Is it 5.4C? Yes. They applied 5.4C, and they used the 2002 provision, not the 1995 provision. They used the one that they adopted in 2003. And we know that because all the copies of the plan also have a 5.4D on it, which wasn't in the earlier plan. But they clearly used that later provision to retroactively cut back benefits. And, again, I know that there's been a lot of policy arguments that were tying the hands of plan sponsors. We're not. They could do it on a going-forward basis, but the anti-cutback statute clearly prohibits a retroactive application that reduces an accrued benefit. And the benefit had accrued for these. Is our Heim case right? It has a pretty, in terms of construing what an amendment is, it seems a little looser than some of the other circuits. Sorry, which case? Heim, is it? Heim. Yes. Yes. No, no. This is perfectly consistent with the other opinions written by this Court. This is a much easier case because, again, all this business about reinterpretation never occurred. Judge McLaughlin dealt with it only because it was an argument raised by defendants, but there's no evidence to support a reinterpretation. And this Court could easily find that the defendants had correctly interpreted the plan to provide an unreduced benefit to this class of participants for 17 years, and that Section 5.4C of the 2002 plan cannot be applied retroactively. It's a straightforward application. It's easier than Bellis. It's easier than Heinz. It's easier than the Bottoni case. It's clearly a bald attempt to, in 2003, adopt a plan amendment, and even some years later, by the way, they continue to pay unreduced benefit for several years after the adoption of this amendment. And the law simply prohibits in a pension plan to go back and retroactively change it. End of story. It's not a difficult case. The evidence is actually fairly simple. It's the clouds of other things that aren't relevant or didn't happen that make it confusing. Thank you very much. On the cross-appeal, you want to? I'll give you a go ahead if you want to. I have a minute. Go ahead. On the cross-appeal, clearly all members of the class were harmed in the same way. All had been promised an unreduced benefit. It has been taken away. And we're simply asking the Court to amend Paragraph H of the lower court's injunctive relief to this class of participants, or this group of participants, and award them the same make-hold relief that was available to them, that's available to everybody else in the class. She apparently, I believe your Pell decision, as well as confirmed by Amara, requires that make-hold relief be given to all participants who have been harmed by a statutory violation. The judge supposedly said there was no evidence, but I think we've outlined the ample evidence in the record that supports this relief, and we're asking for a slight adjustment to Paragraph H of the remedies order. So how significant is the difference between the relief that was actually awarded and the relief you're actually seeking? With respect to Steve Widmer, I think exemplifies it. He started to commence his benefit on his early retirement date, and that was the exact same time that the illegal cutback occurred, and he decided to wait to let his benefit grow. And the calculation, the difference between getting the whole remedy and getting the remedy ordered by the court is something well over $100,000. So for Mr. Widmer, who's the poster child for the injustice here, it's fairly significant. Thank you very much. Mr. Rillo? Your Honor, I have three points on rebuttal, and I'd like to get to them. The first point is Judge Chigaris, you asked two questions about what the amendment is and whether the Hine case is correct. Page 17, 18, 19 of the slip opinion down below, Judge McLaughlin clearly states that the amendment is largely the reinterpretation of the plan after 2005 to read it in a fashion in which he agrees on page 25 it can be read, but to read it that it will not confer subsidized benefits or requires an actuarial reduction. With regard to Hine, as we stated in that brief, Hine is in the teeth of Conkright. Conkright says you can't have one strike and you're out. The facts of Conkright are even more compelling or even more off Judge Ambrose than our case. Conkright's Xerox misinterpreted his plan for 19 years. I thought what Hine said is that an interpretation that's an error of a plan revision that results in an improper denial of benefits to a plan participant may be construed as an amendment. Correct. It does. But it's been read more broadly to indicate that a prior interpretation can rise to an amendment on its own, and Judge McLaughlin makes that clear, that the concept of amendment is flexible. The second point is reinterpretation. Now, the Supreme Court case in Conkright was what, an appeal from a Second Circuit case? It was, Your Honor. Was Hine even mentioned in the Supreme Court's appeal? It was not, nor were the amendment doctrines,  the majority of other circuits have rejected the concept that you can have an amendment without formal writing, and, indeed, this plan does require formal writing. It says that interpretations by the fiduciaries do not constitute amendments. The reinterpretation question that was out at the present, and to make matters clear, 206A, our argument is 206A. It seems to me that to follow your argument to its logical extreme means that the plan administrator could reinterpret a plan at any time when it wants to reduce benefits and say this is a reinterpretation. You could lure prospective employees to come into the employee of the company by having one interpretation of the plan that's current, and then later after they go into pay status, as you call it, say, oh, we're reinterpreting it. Why isn't that a clear violation of the, or what happens to the anti-cutback rule under your approach? It is a violation if the plan, if there's only one interpretation of the plan. Well, let's say there are two interpretations. Well, if there's two interpretations, Conkright answers that question. So what purpose does the anti-cutback rule serve then? Well, it serves the purpose of protecting what's being regarded as a vested right, but on Conkright Conkright, by the way, wasn't an anti-cutback case, right? It doesn't matter. It's a plan interpretation case, and again, we don't get to an anti-cutback claim here unless our plan interpretation is not reasonable or is incorrect, and the district court said on pages 25 and 26 conceded that our interpretation was reasonable. It said there are several interpretations that can be made. So you could do this in one of two ways. You could do it by way of an amendment, but that would violate the anti-cutback rule, but if you call it a reinterpretation, you don't violate the anti-cutback rule. There's no evidence of bad faith here. Everyone conceded that Mr. Laughlin was reasonable, that he was acting in good faith, including many of the class members, including Ms. Colosimo, who was employed by Mr. Laughlin. Furthermore, Judge Vineski, the concept that Mr. Laughlin had brought this up is just not there. It's the plan actuaries, the professionals that are charged that came to Mr. Laughlin and said, Larry, you're screwing the plan up by paying these subsidized benefits, and he testified to that clearly. I mean, there's a concept of the briefs. I know you're doing the process. Just to be absolutely clear, so it's the actuaries that came that said, hey, you're screwing the plan up, and it's not fear that somehow you would lose eligibility because of what the IRS has said with respect to the 80 and 87 plans. Those concepts are tied together, Judge Ambrose. If you're screwing the plan up, they're saying you're threatening the tax qualification of the plan. When did the IRS say you're screwing the tax – possibly screwing up the tax qualification? The IRS didn't say that. I said the actuaries. The IRS never said that. We went with a VCP submission, which they approved, and presented a plan. The third point I want to make – Is there any significance to the fact that when you went through the VCP, you did not submit the 1980 and 1987 plans? No, because generally you submit the plan that's in effect when you file the VCP, and the IRS has the file. They keep all the plans there. But even though the 80 and 87 plans are significantly different than the 95 and 02 plans? They are, but they have the file there, and they presumably would have reviewed them. There's no significance attached to that. And certainly – You're presuming that the IRS has the file and is going to go back and take a look at plans twice removed and three times removed? I do assume that they have a file. I know they have a file. They have a file that they're going to actually look at? A request to pass plans from them and pass cases. Well, that's given – that's suggesting that somebody is doing more due diligence than what normally would be done, right? I see my time has expired. I have one more point if I may. Go ahead. He'll give you one more minute. The final point is on exhaustion. Exhaustion clearly applies here. There's two points about futility. The first is it's a high burden that the plans have to show that there's utter fixed reaction to whatever appeal they take, and none of the plans took an appeal. Calling a plan administrator up does not constitute an appeal. Secondly, you have to move under the case law, that's Harrow, that's Berger, very promptly in order to get relief under futility. You have to run the court and say we're going to file a suit. What about your opponent's argument that this is really a question of anti-cutback as opposed to a mere contract interpretation? It is not. Under Harrow, if the exhaustion claim – You understand, but that's the conclusion. Why is it not? I understand. I'm going to explain that. Okay. Well, it's not a – you don't get a cutback unless you can say underneath interpreting the plan, our plan interpretation is unreasonable, under copyright, is not permissible, something the district court conceded it was. You don't get to that point because there's nothing in the plan that expressly grants these people a subsidized benefit, and that's my pointer in 206A. It's an extra ERISA commitment where clear and plain language has to be there, otherwise the statute mandate takes effect. Okay. Thank you very much. Thank you to both counsel for well-presented arguments. I'll ask the counsel if you would get together with the clerk's office and have a transcript prepared of this oral argument and then split the cost if you would, please. We certainly will. I was going to do that. Thank you very much. We'll call our last case.